**Myrtle B. HELMS, Plaintiff,**

v.

**Joseph A. CALIFANO, Jr., Secretary, Department of Health, Education and Welfare, Defendant.**

**No. C–C–77–327.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

Aug. 8, 1979.

Humphrey Cummings and Paul E. Hemphill, Legal Aid Society of Southern Piedmont, Charlotte, N. C., for plaintiff.

Harold M. Edwards, U. S. Atty., Asheville, N. C., and Wayne C. Alexander, Asst. U. S. Atty., Charlotte, N. C., for defendant.

## ORDER GRANTING BENEFITS

McMILLAN, District Judge.

Plaintiff Myrtle B. Helms brings this action pursuant to 42 U.S.C. § 405(g) to challenge the decision of the Secretary of Health, Education and Welfare. 42 U.S.C. §§ 416, 423. The Secretary determined that plaintiff was entitled to a period of disability beginning November 13, 1975, and ending on December 31, 1976.

Plaintiff filed her claim on January 15, 1976, alleging that she became disabled on March 13, 1975, and was still disabled. Her application was denied and on June 15, 1976, she made a timely request for a hearing, which was held before an administrative law judge on January 24, 1977. Plaintiff testified at her hearing and was represented by a paraprofessional on the staff of Mecklenburg County Legal Aid. In an opinion dated May 24, 1977, the administrative law judge denied Mrs. Helms' claim to benefits, finding that she was under a disability, within the meaning of the Act, beginning on November 13, 1975, and continuing to December 31, 1976, but not thereafter (R.p. 32). This decision was upheld by the Appeals Council in September, 1977.

The plaintiff and the Secretary have moved for summary judgment. There are no genuine issues of material fact and the case is ready for decision. For the reasons which follow I conclude that the decision of the Secretary denying benefits is not supported by substantial evidence in the record and therefore should be reversed.

Plaintiff will continue to meet the special earnings requirement of the Act at least through December 31, 1979 (R.p. 20). The question before the Secretary, therefore, was whether and for what periods plaintiff was under a disability within the meaning of the Act.

At the time of the hearing plaintiff was fifty-four years old. She had a ninth grade education (R.p. 49). Her last employment was as a sales clerk at a local department store. Plaintiff left that job on November 13, 1975. Her testimony at the hearing was that she cannot work because of a number of ailments, including problems with her arthritic pain or arthritic-like pain (R.pp. 50, 52, 53, 55, 61, 69, 70, 71, 72 and 77), hiatal hernia and ulcers (R.pp. 50, 53, 54, 63, 68, 69 and 70), urinary incontinence (R.pp. 50, 51, 54, 57, 72, 73, 74, 77, 78, 79, 80, 83, 84 and 85), headaches (R.p. 55), high blood pressure (R.pp. 55, 56, 60, 66, 68 and 70), anxiety, depression and emotional distress (R.pp. 58, 64, 81 and 82), anemia (R.p. 58), allergy (R.pp. 59, 74, 75 and 76), tuberculosis (R.p. 59), shortness of breath (R.pp. 59 and 75), hormone deficiency (R.pp. 60, 65 and 66), chest pain (R.p. 60), foot pain (R.p. 61), post-operative eye surgery (R.pp. 61, 62 and 78), and a breast tumor (R.p. 77).

Plaintiff also testified about the medicines she takes for her various ailments. They include Valium and Elavil, Premarin, Synthroid, Hydrochlorothiazide, Donnatal Extentabs, Gaviscon and Mylanta. For arthritis she takes Nalfon, Parafon Forte, Fiorinal, and Myoflex. For her bladder she

takes Urised, Macrodantin and Mycostatin. For her allergies she has Benadryl, Naldecon, Phenergan and Polaramine (R.pp. 64–76).

In a lengthy decision, the administrative law judge summarized plaintiff's medical evidence as follows:

"The medical evidence consists of information and reports from Drs. Paul C. Tucker, Chalmers R. Carr, Thomas L. Dulin, Harris Deity Carpenter, John H. E. Woltz and Martin Kreshon, plus records of Charlotte Memorial Hospital, Mercy Hospital and Charlotte Eye, Ear, Nose and Throat Hospital.

"Dr. Woltz's records show he was treating claimant at least by May 1970 for urinary problems and a Marshall-Marchetti operation was to be considered. She underwent the operation at Presbyterian Hospital in August 1970. Dr. Woltz continued to see claimant. When he saw her in November 1972 for recurring incontinence he noted she was under a great deal of emotional stress due to her husband's condition. At that time he advised further surgery, a Goebell-Stoeckel Sling procedure using a fascia strap. Claimant had the surgery at Mercy Hospital in December 1972. Dr. Woltz's notes indicate the operation produced a good result for some time but by November 18, 1974 she was again having trouble emptying her bladder and occasionally wetting the bed.

"During this time claimant was also being treated by Dr. Carr, being seen in March 1970 for acute cervical myositis. He continued to see her for fibromyositis. On April 12, 1974 he saw her for aching in her knees. He also noted claimant was under a great deal of stress with a sick husband. He continued to prescribe Fiorinal in 1974 and 1975.

"Nalle Clinic records reveal that Dr. Tucker examined claimant on September 17, 1974. As nearly as the rather poor copies can be read claimant was seen with complaints of substernal and epigastric pain with a history of such pain for the previous two to three years, almost daily for the last five months. It was increased by lifting, lying down after eating and spices. An upper GI series done earlier revealed a sliding hiatal hernia. There was also evidence of neuromuscular dysfunction in claimant's upper esophagus. At the time claimant was taking Ser-Ap-Es for her blood pressure, had been taking synthetic thyroid for the last ten years, plus Entozyme, Valpin and Mylanta. She was on a bland diet. Orange Juice and aspirin caused stomach burning. She was also taking Fiorinal for headaches, allergy medication, Librax and a hormone. Claimant was five feet, one and a half inches tall, and weighed 157½ pounds. Her blood pressure is illegible. Heart examination revealed nothing unusual. There was two plus ankle edema, no cyanosis, jaundice or sclerodermatic changes seen. Claimant evidently was examined by Dr. Tucker at Mercy Hospital as some of his information is on the hospital's forms.

"On January 6, 1975 Dr. Tucker wrote to Dr. Dulin setting forth his findings on examination and follow through with claimant. He noted six problems, reflux esophagitis and hiatal hernia, salicylate gastritis causing esophagastric pain, hypertension, type IV hyperlipidemia, that claimant had a history of thyroid trouble and had a positive tuberculosis test. An endoscopy done on September 24, 1974 revealed mild to moderate inflammation of the hiatal hernia pouch but biopsies of that area were not dramatic. Claimant was undergoing a hiatal hernia regimen which had been improving her symptoms. She had superficial ulcerations in the antrum of her stomach which responded to antacids and diet. Her hypertension was under control with Ser-Ap-Es, being 130/80 that day. Claimant continued with her synthetic thyroid. She had some ankle edema which Dr. Tucker suggested be treated with diuretics if necessary. Because of her positive tuberculin skin

test she was undergoing a one-year course of preventive treatment with INH and vitamin B–6. Claimant's triglycerides and cholesterol were elevated, her electrocardiogram revealed an abnormality but a vectocardiogram was normal and showed no evidence of her having had a inferior infarction. She underwent a normal treadmill test. His recommendations were that she lose weight, watch her diet, avoid aspirin and continue with her medication. She had responded to the hiatal hernia regimen and did not desire surgery at that time. He felt it should be considered later on if she became very symptomatic again.

"When Dr. Tucker wrote to William H. Booe, attorney-at-law, on June 15, 1976, he reported that claimant had undergone very extensive treatment for hiatal hernia, heartburn and gastric symptoms with intermittent recurrence. He felt her condition would not improve unless she underwent surgery for the hernia. *He stated that when her emotional status and medical problems were added together he did not think she could be gainfully employed and productive.* [Emphasis added.]

"In an undated statement on Charlotte Memorial Hospital stationary *Dr. Carpenter noted that he was treating claimant for urinary incontinence that she had urgency and voided uncontrollably. He stated he did not think he could improve this much and consequently the problem effectively disabled her from any meaningful employment.* [Emphasis added.]

\* \* \* \* \* \*

"Claimant continued to be treated at Charlotte Memorial Hospital. On July 20, 1976 she was diagnosed as having a mild cystocele but the examining doctor did not feel there was anything surgically or medically to offer her. An attempt to repair the cystocele could be made but the return of spontaneous urinary incontinence would be a danger. On July 23, 1976 claimant's blood pressure was 150/85; on August 25, 1976 it was 130/90 and on September 9, 1976 it was 140/94. On the latter date an attempt was apparently made to get claimant to stop taking some of her medicines. She was to be started on silver nitrate for her bladder incontinence. *On September 14, 1976 Dr. Carpenter noted that claimant was unemployable from 'my standpoint', i. e. stress and urge incontinence."* [Emphasis added.]

[R.pp. 23–27.]

Dr. Harris Carpenter of the Charlotte Memorial Hospital Urology Clinic made the following notes during the course of plaintiff's treatment at the clinic:

"This patient has not responded therapeutically to any medications I have used. *No surgical procedure is indication* [sic]. *I do not expect any real improvement in her problem.* [R.p. 245] [Emphasis added.]

\* \* \* \* \* \*

"This lady has rather *marked urge incontinence* which prevents her from traveling in public easily. Since she does often wet herself, it would be hard to find her a job in which her frequency of urination and wetting would not be a problem. Because of this *I consider her essentially disabled."* [R.p. 245] [Emphasis added.]

Dr. Thomas Dulin evaluated plaintiff for the Disability Determination Section of the North Carolina Department of Human Resources on a form dated May 7, 1976. Dr. Dulin stated that plaintiff had the following functional restrictions because of her impairment: During a full work day, plaintiff could stand only 1–2 hours; she could walk only 0–1 hour; the maximum weight she could lift on an occasional basis was negligible; she could not reach above shoulder level; she could do no bending, stooping, or climbing; and she was restricted from heights, mechanical or electrical hazards, and excess dust and lint (R.pp. 160).

■ It is clear that the administrative law judge found that plaintiff had met her

threshold burden of demonstrating that she was unable to return to her prior customary work. The administrative law judge stated:

"The evidence, noted in some detail above, convinces the administrative law judge that a combination of claimant's health and emotional problems reached the point by the alleged date of onset of disability, November 13, 1975, where they rendered her unable to work." [R.p. 28.]

At this point, based on the medical evidence in the record, and independent of the finding by the administrative law judge, plaintiff had met her threshold burden of showing that she was unable to work. The burden then shifted to the Secretary to show that plaintiff retained the residual capacity to engage in substantial gainful activity available in her economy. *Thorne v. Weinberger,* 530 F.2d 580 (4th Cir. 1976); *Taylor v. Weinberger,* 512 F.2d 664 (4th Cir. 1975). The Secretary offered no evidence that plaintiff had such capacity. Yet the administrative law judge was:

" . . . convinced that by the end of 1976, while claimant's health was certainly by no means fully restored, she was no longer so impaired by her ailments that she still could not work as a sales clerk in a store. Consequently her disability ceased by then." [R.p. 31.]

Since there was no medical evidence in the record to support this conclusion, the administrative law judge apparently relied on his own medical knowledge, as shown by the following statements from his decision:

"While claimant has multiple ailments and unquestionably is limited by the state of her health as to what she can do to earn a living the administrative law judge feels that her continuing ailments that are most troublesome because they were less responsive to treatment are bladder incontinence, arthritis or arthritic like ailments, and the emotional strain she was under before her husband died, supplanted by grief immediately after he passed away.

\* \* \* \* \* \*

"Claimant takes medicines to relieve stomach upset. As much of this trouble since at onset appears to have been due to medicines claimant takes, primarily for arthritis, as to anything else. A number of such medicines can cause stomach upset. While claimant has a hiatal hernia the evidence fails to show it is so large as to cause claimant a major problem if she follows her prescribed regimen. Unless they are large a person can live with them with minimal inconvenience if they watch their diet, elevate the head of their bed, don't eat just before retiring etc. Such hernias are more restrictive than disabling and it appears that claimant's hernia is no more serious than that. There is no medical evidence to show that she has had an acute stomach ulcer at any time since onset. The administrative law judge has no doubt she has had such an ulcer in the past but he knows from his own experience with them that they can become severe and with treatment go into remission, sometimes for years.

\* \* \* \* \* \*

"The administrative law judge has no doubt that claimant has arthritis, or a similar ailment, and that this is enough of an impairment to prevent her from doing frequent bending or anything physically strenuous on a continuing basis. No doubt it is painful at times. However a person does not have to be entirely pain free in order to be gainfully employed. The medical evidence however does not point to significant objective findings concerning claimant's ailment or ailments of this nature.

"Claimant has a continuing bladder and urinary ailment, stress incontinence, concerning which the medical evidence is conflicting in the administrative law judge's opinion. Dr. Carpenter is of the opinion that this ailment is disabling. Vocationally speaking the problem with it is largely the inconvenience and embarrassment caused by uncontrolled urination although it can also be painful at

times. If it is frequent enough it is disabling. However it can also be of lesser severity, anywhere from no more than a minor inconvenience to something worse. As the administrative law judge interprets Dr. Woltz's reports and the findings at Charlotte Memorial Hospital when claimant was examined by cystometrogram, this ailment has not been found to be so severe that the use of a pad would not largely alleviate her trouble with wetting her clothes.

"However, in evaluating a claim for disability the individual's ailments cannot be viewed in isolation. As already noted, the administrative law judge is convinced that by November 13, 1975 claimant had to stop working. When the effect of all her ailments is considered together he is also convinced that, in combination, they were of disabling severity for over a year and, consequently she is entitled to a period of disability and disability benefits. He is also convinced that emotional distress was a major factor in bringing about her disability and that the main cause of it at the time was her husband's serious illness. Such emotional stress could be expected to cause more headaches as well as aggravate her arthritis and stomach condition. Also a period of grief is to be expected after a death. However this is something that time eases for most people. There is nothing in the evidence to indicate that this event has caused claimant significantly more emotional distress than the death of a spouse causes most people. At the time of the hearing claimant was rational and coherent and did not appear to be particularly depressed. If claimant has any psychiatric problem it would appear to be her overconcern with her various ailments and the state of her health, which she needs to try to get off her mind. The administrative law judge got the definite impression that he heard a recitation from her of all her ailments of recent years as they were at their worse." [R.pp. 28–30.]

■ It does not appear to be within the authority of the administrative law judge to base his decision on his own medical opinions where he was not qualified on the record as a medical expert, and there was no other medical evidence in the record to support his conclusions. *Day v. Weinberger,* 522 F.2d 1154, 1156 (9th Cir. 1975). Such action by the administrative law judge is an impermissible encroachment on the right of the plaintiff to have her case decided, to the extent possible, *on the record. See Little v. Califano,* 462 F.Supp. 575, 580 (W.D.N.C.1978).

■ The administrative law judge found that plaintiff was incapable of returning to her prior customary work, but referred to no specific, significant evidence in the record probative of his conclusion that by the end of 1976, plaintiff's disability had ceased. Also there was no evidence offered by the Secretary to show that there remained jobs in plaintiff's economy which she could perform. The Secretary has failed to meet his burden; the record only supports a finding of disability.

Where the Secretary's decision is clearly erroneous on an adequate record, his decision should be reversed without requiring that the matter be remanded for additional factfinding. *See, e. g., Vitek v. Finch,* 438 F.2d 1157 (4th Cir. 1971).

IT IS THEREFORE ORDERED that the Secretary's motion for summary judgment is denied; that plaintiff's motion for summary judgment is granted; and that the case is remanded to the Secretary for determination of the appropriate disability onset date and for computation and payment of the benefits for which plaintiff is eligible.